IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 14, 2009

**STATE OF TENNESSEE v. ARTERIO HOLMAN**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 07-03279     John T. Fowlkes, Jr., Judge**

**No. W2008-00318-CCA-R3-CD  -  Filed June 26, 2009**

The defendant, Arterio Holman, was convicted by a Shelby County Criminal Court jury of simple possession of cocaine and possession with intent to deliver 26 grams or more of cocaine. The trial court merged the simple possession conviction with the possession with intent to deliver conviction and sentenced the defendant as a Range I offender to eleven years in the Department of Correction. On appeal, he argues that (1) the trial court erred in allowing an officer to testify as an expert on drug trade, (2) the evidence was insufficient to sustain his conviction for possession with intent to deliver more than 26 grams of cocaine, (3) the trial court imposed an excessive sentence, and (4) cumulative error compromised his rights to a fair trial and due process. After review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and J.C. MCLIN, JJ., joined.

Robert Wilson Jones, District Public Defender; Phyllis Aluko (on appeal) and Glenda Adams (at trial), Assistant Public Defenders, for the appellant, Arterio Holman.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; William L. Gibbons, District Attorney General; and Christopher West, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

In March 2007, the defendant was indicted on one count of possession with the intent to sell 26 grams or more of cocaine and one count of possession with the intent to deliver 26 grams or more of cocaine as a result of activities that took place on January 24, 2007. A trial was conducted in November 2007.

**State's Proof**

Detective Willie Mathena, a thirteen-year veteran of the Memphis Police Department, testified that he was presently assigned to the Auto Cargo Theft Task Force but had also worked as a patrolman and on a "Zero-Tolerance" Task Force that concentrated on burglaries and drug sales. On January 24, 2007, Detective Mathena was called to 3479 Hobson Road in Shelby County to conduct an investigation regarding stolen cargo potentially located at that residence. When he and the lead detective arrived at the residence, they obtained verbal and written consent from the homeowner to search the house.

Detective Mathena testified that when the homeowner opened the door, he smelled "an extreme[ly] strong odor of marijuana" coming from inside. The marijuana smoke inside the house was so thick he could barely see. When he walked into the living room, he saw a man, identified as the defendant, and woman sitting on a couch. As Detective Mathena approached the couple, the defendant reached for a jacket on a nearby loveseat. Fearful that a weapon might be underneath or inside the jacket, Detective Mathena grabbed it before the defendant. Detective Mathena noticed that the jacket "felt kind of heavy" on one side and noticed a clear plastic bag containing a white, powdery rock substance about the size of a "golf-ball-and-a-half." Based on his experience, Detective Mathena suspected that the powdery substance was either cocaine or heroin.

Detective Mathena testified that as soon as he grabbed the jacket, the defendant exclaimed, "Hey, man, look, that's my jacket. That shit in my jacket is mine. . . . I smoke it. I don't sell it. I'm sprung." He advised the defendant not to make any other statements, confiscated the substance, and patted the defendant down for weapons. Detective Mathena found approximately $750 in the defendant's front pants pocket, with the bills organized in denominations and turned in the same direction. He could not recall the exact denominations, but he knew there were "twenties, tens, fives, [and] maybe some fifties." The money smelled of marijuana. He field-tested the powdery substance, and it tested positive for cocaine and weighed approximately 30 grams.

Detective Mathena testified that as part of the Auto Cargo Theft Task Force, his responsibilities involved making purchases of, among other things, "[m]arijuana, cocaine, stolen cars, [and] stolen guns." He explained that the task force deals with all crimes, "from A to Z," and that "[a]ll of the crime is connected to drugs." He stated that when he was a member of the "Zero-Tolerance" Task Force, he participated in undercover drug operations and first became familiar with the drug trade. Through his training and experience, he learned drug sale "lingo" and how much certain drugs cost, things an average police officer would not know. Over objection, Detective Mathena was accepted by the court as an expert on narcotics sales and undercover operations involving narcotics.

Detective Mathena testified that a normal cocaine purchase, for someone who did not want to look suspicious and who did not know the dealer, would be an "eight-ball," which would provide "four or five good lines of . . . pure cocaine" or five to six "good size crack rocks." He said that an "eight-ball" is approximately 15 grams. Detective Mathena said that a typical buy for a hit of

cocaine would at most be 2.5 to 3.5 grams, which would give four to five lines. A smoker would pay approximately $20 for 0.5 gram, and 3.5 grams would cost between $100 and $125. An average user would have one or two crack rocks, each weighing only .03 to 0.1 grams. Most users do not keep large amounts of cocaine with them but only buy what they need for that particular moment.

On cross-examination, Detective Mathena testified that the defendant had what amounted to an "eight-ball" and an ounce of pure powder cocaine. He acknowledged that some drug dealers individually package their drugs for resale and that the cocaine in the defendant's jacket pocket was in one plastic bag. He also said that drug dealers often organized their money by denomination and direction. Detective Mathena stated that he always checked a suspect's money to document that nothing was stolen. He acknowledged that the defendant appeared to be slightly under the influence when he first saw him.

Dalinda Franklin with the Organized Crime Bureau of the Memphis Police Department testified that she transported the evidence collected in this case to and from the Tennessee Bureau of Investigation (TBI) for testing.

Melanie Johnson, TBI special agent and forensic scientist, analyzed the substance found in the defendant's jacket. The substance weighed 28 grams and was positive for cocaine.

**Defense Proof**

Ellowee Cassey, the defendant's aunt, testified that the defendant lived with her in January 2007. She said she had never seen the defendant use drugs but knew that he did so. She described the defendant's demeanor as "real quiet" when he was not under the influence but as "lively" when he used drugs. She had seen him with "[l]arge amounts" of "[p]owder" in his possession but "[n]ot that often." To her knowledge, the defendant had never sold drugs.

Ms. Cassey acknowledged that she did not know what kind of drugs the defendant used because he would "go out in the back yard and use it." She said that the defendant was not working when he lived with her, but he occasionally gave her money for rent. She periodically gave the defendant money but never more than seventy-five dollars at a time. She was not aware of anyone else giving the defendant money. The defendant bought clothes and shoes for himself approximately once a month. The defendant's girlfriend visited at times and used drugs with the defendant in the backyard.

Jamie Mason, the defendant's sister, testified that she had never known the defendant to sell drugs but knew that he used powder cocaine. Ms. Mason used to smoke marijuana and would look for the defendant to obtain some marijuana and smoke it with him. She estimated that the defendant had been using drugs for three years. She did not know whether the defendant was working in January 2007. She went with the defendant and his girlfriend to a club a few times, and the defendant sometimes paid her entrance fee and bought his own drinks. The defendant used drugs

at his friend's house or a motel, and she saw him "do a line . . . [o]n his pink[ie] or his girl's pink[ie]."

The defendant testified that on January 24, 2007, he and his girlfriend were at his sister's house "[s]moking weed, getting high" when the police arrived, told everyone to "[f]reeze," and searched the house. An officer found drugs in his jacket located a few feet away from him. The defendant told the officer that the drugs were his and that he and his girlfriend were using them. The defendant said that his sister and her daughter were also at the house that night, but his sister did not use drugs.

The defendant explained that he had been "getting high" since his birthday, which was two days earlier. He got a "package deal" for his birthday from his dealer, meaning his dealer added some extra as a "gift" to the amount he purchased. He estimated that he purchased 22 grams for approximately $350. He elaborated that he actually bought 10 grams on his birthday and then returned the next day to buy 16 to 20 more, which was when his dealer gave him the extra. The defendant explained that he bought such a large amount because he and his girlfriend were planning to get high for seven or eight days. He was not working at the time and got the money to purchase the drugs from his girlfriend who worked at McDonald's and had just gotten her tax refund.

The defendant testified that he had been using cocaine and marijuana since the age of twelve and had been using Ecstasy for the last four years. He had never had a real job and supported his drug habit by getting money from family members or his girlfriend and winnings from a casino or dice game on the street. He also chose to date women who worked and used drugs. He said that the money found in his pants pocket was his girlfriend's tax refund money that she gave him for his birthday. His girlfriend had given him approximately $1700 that week.

The defendant testified that he had "never sold drugs a day in [his] life." He explained that the reason he had such a large amount of cocaine was because it was for both him and his girlfriend, they both used a lot of drugs, and they were planning on using for four or five days. He said that a "normal" purchase for him was approximately a quarter-ounce. He then said that he bought about 10 grams of cocaine for $120 to $125 "[p]robably every day." The defendant stated that he sometimes worked through a temporary agency but would work a week and then quit after getting paid. He was paid approximately $300 a week, and the money lasted only a few days.

## ANALYSIS

### I. Expert Testimony

The defendant argues that the trial court erred in allowing Detective Mathena to testify as an expert witness on matters regarding drug trade. He specifically argues that there was a lack of evidence as to the extent of Detective Mathena's prior dealings with powder cocaine users and that Mathena testified inconsistently at times.

The trial court is given broad discretion in resolving questions concerning the admissibility of expert testimony, and we will not overturn its ruling absent a finding that it abused its discretion. See State v. Stevens, 78 S.W.3d 817, 832 (Tenn. 2002); State v. Coley, 32 S.W.3d 831, 833 (Tenn. 2000); State v. Ballard, 855 S.W.2d 557, 562 (Tenn. 1993). "The abuse of discretion standard contemplates that before reversal the record must show that a judge 'applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" Coley, 32 S.W.3d at 833 (quoting State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999)). Moreover, expert testimony must be both relevant and reliable before it may be admitted. McDaniel v. CSX Transp., Inc., 955 S.W.2d 257, 265 (Tenn. 1997). Tennessee Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

In this case, Detective Mathena testified that he had attended drug school and taken classes on "drugs, crack, [and] marijuana." He previously worked with the "Zero-Tolerance" Task Force which concentrated, in part, on drug sales. As part of that task force, he did what the patrol officers did not have time to do, including "check[ing] the streets for . . . drug trafficking and drug and drug sales." He was involved in undercover drug buys and apprehending individuals with narcotics. He had to become familiar with street terminology and the cost of various drugs. As part of his current assignment with the Auto Cargo Theft Task Force, Detective Mathena was involved in undercover purchases of "[m]arijuana, cocaine, stolen cars, stolen guns, you name it, we buy it all." He explained that the Auto Cargo Theft Task Force was unique in that "[they] do it all. . . . [Y]ou realize that your burglars are your drug dealers, your drug sellers. They drive nice cars. You[r] people stealing cars are stealing them to sell drugs. . . . All of the crime is connected to drugs. It always comes back to drugs and guns." As a member of this task force, he had to become familiar with drug terminology and how much to pay for certain narcotics because he oftentimes did not carry a gun and a dangerous situation could arise if the dealer became suspicious. He noted that the average patrolman knew about drugs but not about drug sales and undercover buys. He said that he has "had a lot of training, but no training amounts to actual street experience."

We conclude that the trial court did not abuse its discretion in allowing Detective Mathena to testify as an expert witness regarding normal purchase amounts of cocaine users. Detective Mathena's testimony indicated that from his various assignments in his thirteen years on the police force, he had gained a specialized knowledge in matters regarding the drug trade. From his involvement in undercover drug buys, he had learned average purchase amounts, cost, and terminology. This court has previously held that an officer may testify about matters relating to drug trade under Tennessee Rule of Evidence 702. See, e.g., State v. Daniel Potin, No. W2005-01100-CCA-R3-CD, 2006 WL 1548672, at *4 (Tenn. Crim. App. June 7, 2006), perm. to appeal denied (Tenn. Nov. 13, 2006); State v. Timoty Murrell, W2001-02279-CCA-R3-CD, 2003 WL 21644591, at *6-7 (Tenn. Crim. App. July 2, 2003).

The defendant asserts that inconsistencies in some of Detective Mathena's answers indicate a lack of trustworthiness as to his expertise regarding drug purchases. In particular, the defendant points out that Detective Mathena testified a normal buy was an "eight-ball" and then later said a normal buy for a smoker was 0.5 grams. A close reading of the record shows that Detective Mathena said a normal buy for him in his capacity as an undercover officer was an "eight-ball" as an amount that would not arouse suspicions and which he prefaced by saying "[he] could purchase quite a bit." The defendant is not entitled to relief on this issue.

## II. Sufficiency

The defendant challenges the sufficiency of the convicting evidence, arguing that the "dearth of evidence would prevent a rational trier of fact from finding him guilty beyond a reasonable doubt of unlawful possession of a controlled substance with intent to deliver 26g or more of cocaine." When reviewing a challenge to the sufficiency of the convicting evidence, we note that the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The defendant argues that the jury's decision to convict him in count one of simple possession rather than possession with intent to sell 26 grams or more of cocaine casts doubt on his conviction for possession with intent to deliver and suggests that the jury must have found that the cocaine was for personal use. However, the jury was instructed to consider each count as a separate

and distinct offense, and, as correctly noted by the State, consistency of verdict is not required, so long as "the evidence establishes guilt of the offense upon which the conviction was returned." Wiggins v. State, 498 S.W.2d 92, 94 (Tenn. 1973); State v. Hayes, 7 S.W.3d 52, 57 (Tenn. Crim. App. 1999); State v. Tony Scott Walker, No. 02C01-9704-CC-00147, 1997 WL 746433, at *3-4 (Tenn. Crim. App. Dec. 3, 1997), perm. to appeal denied (Tenn. Sept. 21, 1998). We will not speculate on the jury's reasoning for returning with a conviction on a lesser-included offense in the first count and will independently assess the sufficiency of the evidence convicting the defendant of possession with intent to deliver 26 grams or more of cocaine.

In addressing this issue, we note that the defendant does not contest that he possessed the cocaine; instead, he contends that it was for his personal use and there was insufficient proof that he intended to deliver it. Possession of 26 grams or more of cocaine with the intent to deliver is a Class B felony. Tenn. Code Ann. § 39-17-417(a)(4), (c)(1), (i)(5). Tennessee Code Annotated section 39-17-419 provides, "It may be inferred from the amount of a controlled substance or substances possessed by an offender, along with other relevant facts surrounding the arrest, that the controlled substance or substances were possessed with the purpose of selling or otherwise dispensing." Id.; see State v. Nelson, 275 S.W.3d 851, 866-67 (Tenn. Crim. App. 2008); State v. Toney L. Conn, No. M2005-02899-CCA-R3-CD, 2006 WL 3498048, at *5-6 (Tenn. Crim. App. Nov. 21, 2006), perm. to appeal denied (Tenn. Mar. 12, 2007) (citing various factual scenarios surrounding a defendant's possession of cocaine where this court found the evidence sufficient to prove intent).

Detective Mathena testified that the cocaine found in the defendant's possession weighed 30.2 grams in the property room and, "at the most," a normal buy for a user was 2.5 to 3.5 grams. He said that, in his experience, users do not usually keep large amounts in their possession but only buy what is needed for that particular moment or hit. He testified that 3.5 grams of cocaine would cost $100 to $125. In addition, when Detective Mathena encountered the defendant, there was evidence that the defendant had been smoking marijuana, not using cocaine. There was no testimony that any paraphernalia for using cocaine was found on the defendant. Moreover, the defendant, who admitted to never having a real job, had $750 cash in his possession in various smaller denominations, organized by denomination and facing the same direction. The jury heard the defendant's explanation for why he possessed the large amount of cash and cocaine and, by its verdict, discredited that explanation. We conclude that in the light most favorable to the State, the evidence was sufficient for a rational trier of fact to find that the defendant possessed the cocaine with intent to deliver and thus sustain the verdict.

### III. Sentencing

The defendant argues that the trial court imposed an excessive sentence "because [the court] failed to acknowledge the proffered mitigating factors presented by the defense." When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record "with a presumption that the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2006). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing

principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); State v. Bonestel, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000).

In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statements made by the accused in his own behalf, and (h) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210 (2006); State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401 (2006), Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169.

As noted above, the defendant was convicted of a Class B felony. A standard offender convicted of a Class B felony is subject to a potential sentence of eight to twelve years. Tenn. Code Ann. § 40-35-112(a)(2). In sentencing the defendant, the trial court noted that it was taking into account the trial testimony, arguments at sentencing, the presentence report, the facts and circumstances of the case, and any enhancement and mitigating factors. The court observed that the defendant had a "very significant criminal history," including two felony convictions and several misdemeanor convictions, see id. § 40-35-114(1), and that he had violated his probation in the past and committed offenses while on probation. See id. § 40-35-114(8). The court did not find any mitigating factors applicable to the defendant's case. The court sentenced the defendant to eleven years in the Department of Correction.

We conclude that there is no error in the trial court's sentencing determinations. It appears from the presentence report that since the age of nineteen, the defendant has been convicted of two felonies and thirteen misdemeanors and has violated his probation. The seven-year gap in his criminal record was when he was serving his sentence for aggravated robbery. In imposing a specific sentence within a range, a trial court "shall consider, but is not bound by," certain advisory sentencing guidelines, including that the "minimum sentence within the range of punishment is the sentence that should be imposed" and that "[t]he sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors[.]" Id. § 40-35-210(c)(1), (2) (2006). The weighing of the various mitigating and enhancement factors is "left to the trial court's sound discretion." State v. Carter, 254 S.W.3d 335, 345 (Tenn. 2008). The record supports the sentence imposed by the trial court. The defendant has not, therefore, met his burden of showing that his eleven-year sentence is excessive.

## IV. Cumulative Error

The defendant argues that he is entitled to relief due to cumulative error at trial. Having found no errors committed by the trial court, we respectfully disagree.

## CONCLUSION

Based on the aforementioned authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE